# 15-2220-cr,
## 15-2247(CON), 15-2257(CON), 15-4042(CON)

# United States Court of Appeals
### *for the*
# Second Circuit

---

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

LEONIDES SIERRA, AKA Sealed Defendant 1, AKA Junito, AKA Junior,
RICHARD GONZALEZ, AKA Sealed Defendant 2, AKA Webb, AKA Webb
Killa, JOSE CRUZ, AKA Sealed Defendant 3, AKA Prostituto, AKA Prosti,
Edwin Ciriaco, Sealed Defendant 5, AKA Machete, AKA Bobie, ANIBAL
RAMOS, AKA Sealed Defendant 6, AKA Moreno,

*(For Continuation of Caption See Inside Cover)*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLANT CARLOS LOPEZ

EZRA SPILKE
LAW OFFICES OF EZRA SPILKE, PLLC
25 Eighth Avenue, Suite C
Brooklyn, New York 11217
(646) 762-9713

SUSAN GAIL KELLMAN
LAW OFFICES OF SUSAN G. KELLMAN
25 Eighth Avenue, Suite C
Brooklyn, New York 11217
(718) 783-8200

*Attorneys for Defendant-Appellant Carlos Lopez*

ALFRED LAFORD, AKA Sealed Defendant 7, AKA Sony, ANTONIO PENA, AKA Sealed Defendant 8, AKA La Percha, JULIO BRITO, AKA Sealed Defendant 9, AKA Fresh, JUAN NUNEZ, AKA Sealed Defendant 10, AKA Jesu Christo, CHRISTOPHER JOHNSON, AKA Sealed Defendant 11, AKA Chris, DONALD NOVAS, AKA Sealed Defendant 12, AKA Oliver, AKA Soca, AKA Vale, AKA Fish, JOSE FELICIANO, AKA Sealed Defendant 13, AKA Lito, JOSE MARMELEJOS, AKA Sealed Defendant 16, AKA Ochenta, NOEL ACOSTA-DISLA, AKA Sealed Defendant 17, AKA Fugitivo, TOMAS CASTILLO, AKA Sealed Defendant 18, AKA Chobolo, AKA Chobolito, HUGO ALMONTE, AKA Sealed Defendant 19, AKA Fufu, CESAR ALMONTE, AKA Sealed Defendant 20, AKA Bullet, CARLONELL PAULINO, AKA Sealed Defendant 21, AKA Pope, RONALD PERALTA, AKA Sealed Defendant 22, AKA Romo, JOSE CASTILLO, AKA Sealed Defendant 23, AKA Smith, AKA Jay Blanco, AKA Daddy, MARK MARTINEZ, AKA Sealed Defendant 24, JOSE BALLENILLA, AKA Sealed Defendant 25, AKA Correa, LUIS CABRERA-RECIO, AKA Sealed Defendant 27, AKA Nueve, AKA Nuevecito, LOREN GUZMAN, AKA Sealed Defendant 28, AKA Crispy, MELVIN AMPARO, AKA Sealed Defendant 29, AKA Flynt, JONATHAN MAJDANSKI, AKA Sealed Defendant 30, AKA Indio, MIGUEL STRONG, AKA Sealed Defendant 31, AKA Kiki, JOSE BARCARER, AKA Sealed Defendant 32, AKA Papotico, AKA Basura, JOSE GERONIMO-FIGUEROA, AKA Sealed Defendant 33, AKA Mocha, EDGARDO PONCE, AKA Sealed Defendant 34, AKA Tito, MICHAEL DELACRUZ, AKA Sealed Defendant 35, AKA 40, DAVID PATINO, AKA Sealed Defendant 36, AKA Bori, AKA Chingo, EDUARDO HOLGUIN, AKA Sealed Defendant 37, AKA James Baston, RONNY EVANGELISTA, AKA Sealed Defendant 38, LUIS CABRERA, AKA Sealed Defendant 39, AKA Bling Bling, MR. CARLOS RODRIGUEZ, AKA Sealed Defendant 40, HENRY O. PENA, AKA Sealed Defendant 41, AKA Melmo, DAVE MCPHERSON, AKA Sealed defendant 42, VANCE HILL, AKA Sealed Defendant 43, AKA Shata, GREYDIN LIZ-CASTILLO, AKA Sealed Defendant 44, AKA Pollito, NELSON JORGE-MARTINEZ, AKA Sealed Defendant 45, AKA Chico Chico, LUIS SALADIN, AKA Sealed Defendant 46, AKA King, CHRISTOPHER ROBLES, AKA Sealed Defendant 47, AKA Dorita, JOSEPH HERNANDEZ, AKA Sealed Defendant 48, JONATHAN EVANGELISTA, AKA Sealed Defendant 49, HENRY PAULINO, AKA Sealed Defendant 50, AKA Bam Bam, JUAN CARLOS GIRALDO FRANCO, ALEJANDRO SORIANO, LENIN MOREL, LIZARDI, LEWIS SANTOS, MARIA MEJA, JOSE MEIJA, JAVIER BELTRAN, MICHEAL CABRERA, JULIAN LOPEZ, CHRISTIAN NIEVES, YANDEL SILVERIO, VLADAMIR DIAZ, ANDRY LAZALA, RAYMOND SOSA, MANUEL GERALDO, HARGELIS VARGAS, JOAN VASQUEZ, ARGENIS GUILLEN, HERIBERTO MARTINEZ, ANDY CIPRIAN, ALBERT SALCE, ANDERSON ABREU, CARLOS URENA, AKA Sealed Defendant 4, AKA Salcedo, AKA White Boy, LIMET VASQUEZ, MIGUEL DELANCE,

*Defendants,*

CARLOS LOPEZ, AKA Sealed Defendant 15, AKA Carlito, LUIS BELTRAN, AKA Sealed Defendant 26, AKA Gualey, FELIX LOPEZ-CABRERA, AKA Sealed Defendant 14, AKA Suztancia, JUGO CESPEDES,

*Defendants-Appellants.*

_____

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... ii

JURISDICTIONAL STATEMENT ........................................................1

ISSUES FOR REVIEW ..........................................................................1

STATEMENT OF THE CASE AND FACTS ........................................1

   1. Trial ................................................................................................1

   2. Sentence .........................................................................................4

SUMMARY OF ARGUMENT .............................................................5

ARGUMENT ...........................................................................................6

  I. Lopez's Mandatory Life Sentence Categorically Violates the Eighth Amendment because of Lopez's Age and Role in the Offense .........................6

    A. Applicable Law ...........................................................................6

    B. Discussion ...................................................................................9

      a. Objective Indicia of Society's Standards................................9

      b. Judicial Exercise of Independent Judgment...........................11

  II. The Eighth Amendment Mandates that the Sentencing Court Individually Consider Lopez's Sentence .......................................21

    A. Applicable Law ...........................................................................21

    B. Discussion ...................................................................................22

  III. Joining in the Arguments of Codefendants .............................29

CONCLUSION........................................................................................29

CERTIFICATE OF COMPLIANCE ..................................................30

# TABLE OF AUTHORITIES

## CASES

*Atkins v. Virginia*, 536 U.S. 304 (2002)...................................................................8

*Cephas v. Nash*, 328 F.3d 98 (2d Cir. 2003) ...........................................................14

*Eddings v. Oklahoma*, 455 U.S. 104 (1982) ...........................................................17

*Enmund v. Florida*, 458 U.S. 782 (1982) ......................................................... 12, 13

*Ewing v. California*, 538 U. S. 11 (2003) ..............................................................18

*Graham v. Florida*, 560 U.S. 48 (2010) ....................................................... passim

*Harmelin v. Michigan*, 501 U.S. 957, 1005 (1991) .................................................7

*Johnson v. Texas*, 509 U.S. 350 (1993) .................................................................22

*Kennedy v. Louisiana*, 554 U.S. 412 (2008) ............................................................8

*Lockett v. Ohio*, 438 U.S. 586 (1978) ....................................................................17

*Miller v. Alabama*, 567 U.S. __, 132 S. Ct. 2455 (2012) ............................... passim

*Pinkerton v. United States*, 328 U.S. 640 (1946).....................................................14

*Roper v. Simmons*, 543 U.S. 551 (2005) ........................................................ passim

*Sumner v. Shuman*, 483 U.S. 66 (1987)...................................................................17

*Thompson v. Oklahoma*, 487 U.S. 815 (1988)........................................................21

*Tison v. Arizona*, 481 U.S. 137 (1987) ...................................................... 13, 16, 18

*United States v. Reingold*, 731 F.3d 204 (2d Cir. 2013).............................. 6, 16, 17

*Woodside v. North Carolina*, 428 U.S. 280 (1976) ................................................16

## STATUTES

18 U.S.C. § 1111 ...................................................................................................10

18 U.S.C. § 1114 ...................................................................................................10

18 U.S.C. § 1116 ...................................................................................................10

18 U.S.C. § 1118 ...................................................................................................10

18 U.S.C. § 1119 ...................................................................................................10

18 U.S.C. § 1120 ...................................................................................................10

18 U.S.C. § 1121 ...................................................................................................10

18 U.S.C. § 115 .....................................................................................................10

18 U.S.C. § 1203 ...................................................................................................10

18 U.S.C. § 1503 ...................................................................................................10

18 U.S.C. § 1512 ...................................................................................................10

18 U.S.C. § 1751 ...................................................................................................10

18 U.S.C. § 1959 .................................................................................................9, 10

18 U.S.C. § 351 .....................................................................................................10

18 U.S.C. § 930 .....................................................................................................10

21 U.S.C. § 675 .....................................................................................................10

28 U.S.C. § 1291 .....................................................................................................1

# OTHER AUTHORITIES

*Adolescence Definition*, Dorland's Medical Dictionary for Health Consumers ......24

*Adolescence Definition*, Mosby's Medical Dictionary, 8th ed. 2009 ......................24

*Adolescence Definition*, The American Heritage Medical Dictionary, http://mcaf.ee/lkqm7 ........................................................................................24

Brian R. Gallini, *Equal Sentences for Unequal Participation: Should the Eighth Amendment Allow All Juvenile Murder Accomplices to Receive Life Without Parole?*, 87 Or. L. Rev. 29 (2008) ....................................................................14

Brief for American Psychological Association et al. as Amici Curiae Supporting Petitioners 4, *Miller v. Alabama*, 132 S. Ct. 2455 (Nos. 10-9646, 10-9647) .......23

Brief for the American Medical Association and the American Academy of Child and Adolescent Psychiatry as Amici Curiae in Support of Neither Party 20-23, *Graham v. Florida*, 560 U.S. 48 (2010) (Nos. 08-7412, 08-7621) ......................24

Dana Goldstein, "Too Old to Commit Crime?" *N.Y. Times*, Mar. 22, 2015, at SR4 ..................................................................................................................27

Katharine Q. Seelye, *Dispute Over Witnesses Interrupts Boston Marathon Trial*, N.Y. Times, May 8, 2015, at A15 ..................................................................18

Laurence Steinberg, *A social neuroscience perspective on adolescent risk-taking*, 28 Developmental R. 78 (2008) ............................................ 25, 26, 27

M.R. Asato et al., *White Matter Development in Adolescence: A DTI Study*, Cerebral Cortex (Sep. 2010) ..................................................................27

Nat'l Research Council, *Reforming Juvenile Justice: A Developmental Approach* (Wash., D.C.: The Nat'l Academies Press 2013) ......................................... 26, 27

S. Rep. No. 98-225 ..................................................................................20

Sarah A. Dunlop, et al., *Repeated prenatal corticosteroids delay myelination in the ovine central nervous system*, 6 J. Maternal-Fetal and Neonatal Med. 309-13 (1997) ..........................................................................................26

U.S. Sentencing Comm'n, *2010 Sourcebook of Federal Sentencing Statistics* .......10

U.S. Sentencing Comm'n, *2013 Sourcebook of Federal Sentencing Statistics* .......10

U.S. Sentencing Comm'n, *2014 Sourcebook of Federal Sentencing Statistics* (2014) ..........................................................................................28

U.S. Sentencing Comm'n, *Life Sentences in the Federal System* 5 (2015) .............10

U.S. Sentencing Comm'n, *Report to Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System* (October 2011) .........................................10

# CONSTITUTIONAL PROVISIONS

U.S. Const. amend. VIII ............................................................................6

# JURISDICTIONAL STATEMENT

Carlos Lopez filed a timely notice of appeal from a judgment of conviction entered on July 8, 2015, in the United States District Court for the Southern District of New York (Engelmayer, J.). A266; *see* A259.[1] Jurisdiction rests on 28 U.S.C. § 1291. Jurisdiction in the district court below was asserted by the appellee, the United States of America.

# ISSUES FOR REVIEW

1. Whether Lopez's mandatory life sentence categorically violates the Eighth Amendment because of his age and his role in the murders as an accomplice and a minor participant.

2. Whether the district court erred in declining to consider factors particular to Lopez's history, personal characteristics and role in the offenses and to fashion a sentence based on those factors.

# STATEMENT OF THE CASE AND FACTS

## 1. Trial

After an eleven-week jury trial, Lopez—along with two of his codefendants, his brother Felix Lopez-Cabrera and Luis Beltran—was found guilty of fourteen crimes related to his membership or association with the Bronx Trinitarios Gang ("BTG" or "Trinitarios"). At trial, the government employed the testimony of eleven cooperating witnesses, all but three of whom faced mandatory life sentences had they not cooperated with the government. *E.g.*, A115, A116, A124-25, A132,

---

[1] Citations beginning with "A" refer to the Appendix page.

A137, A150, A154. The jury found that BTG was a racketeering enterprise pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., and that Lopez, as an employee or associate of the BTG, participated in the conduct of its affairs through a pattern of racketeering activity and conspired to do so. A156-67; *see* 18 U.S.C. §§ 1962(c), 1962(d). Most relevant to this appeal, Lopez was also convicted of three counts of murder in aid of racketeering, each of which, pursuant to 18 U.S.C. § 1959(a)(1), carries a mandatory minimum sentence of life imprisonment. A156-67.

Two of the murders occurred on May 23, 2010 (the "Double Homicide"), when Lopez, Lopez-Cabrera and a third Trinitario, Cesar Almonte, arrived together at the scene of a skirmish between a fourth Trinitario, Jose Ballenilla, and members of another gang called Dominicans Don't Play ("DDP"). Cooperating witnesses testified that Trinitarios had been clashing with other gangs all night, and Ballenilla, cooperating with the government, testified that he had called Lopez for backup when he encountered the DDPs. A117. Low-quality surveillance footage from nearby buildings captured the scene, and a cooperating witness identified the participants. A119-21. The video evidence showed a taxicab stopping down the street from the skirmish, three people—Almonte, Lopez-Cabrera and Lopez— exiting the taxi, and muzzle flashes emanating from Lopez-Cabrera's extended arm. A119. After the gunshots began, the DDPs fled, and the Trinitarios pursued

them down the street. A119-21. Two of the DDPs were struck by Lopez-Cabrera's gunfire and died from their wounds. A122. The Trinitarios escaped to another Trinitario's apartment. A122-23. The entire episode, from the taxicab pulling up to the Trinitarios' escape, lasted approximately ten seconds. There was no evidence that Lopez was armed during the chase.

The third murder occurred on November 20, 2010, after Almonte and another Trinitario, Michael Cabrera, had fought with the eventual murder victim, Freddy Polanco, in the vicinity of 190th Street and University in the Bronx. A133. During the melee, Almonte received a cut to his ear, and he and Cabrera fled to 228th Street in the Bronx. *Id.* Cabrera, who cooperated with the government, testified at trial:

> When we were [at 228th Street], Carlos is coming out of his girlfriend's house. We explained to him what happened and he said: Look. I'm going home to go to sleep. I'm not up to doing that. He gets into a taxi and then maybe, like, one or two minutes after the taxi took off he just gets out of the taxi and he said: Come on. Let's go there.

*Id.* Cabrera, Lopez and two other Trinitarios, Raymond Sosa and Nathaniel Flores, who also cooperated and testified at trial, then took a taxicab to the area where the fight with Polanco had happened earlier. *Id.* Flores was carrying a gun and, according to Flores and Sosa, Lopez asked for it while they were in the taxi. A128, A140. But Flores refused and kept the gun himself. A128, A140.

When the taxi arrived at 190th Street, the four Trinitarios began searching for Polanco on foot. A128, A133, A145. After walking for a little while, they ended up entering a building. A128, A145. The four Trinitarios found Polanco sitting on the stairs in the lobby of the building. A146. The Trinitarios confronted Polanco, who reached behind him as if going for a gun. *Id.* At that point, Flores raised his gun and opened fire. *Id.* Polanco fled up the stairs, and Flores continued shooting. *Id.* Bullets felled Polanco at the top of the stairs, where he died. A131.

Sosa testified that, when he and Lopez were housed together at Rikers Island, Lopez told him that, had Flores given him the gun on the night Polanco was killed, they would not have been arrested because Lopez would have only scared Polanco with the gun without pulling the trigger. A153. Almonte, who—in addition to being a central part of the Polanco murder—was in the taxicab with Lopez and Lopez-Cabrera on the night of the Double Homicide, cooperated with the government but was not called as a witness. *See* A140-44.

### 2. Sentence

In advance of sentencing, Lopez, Lopez-Cabrera and Beltran jointly requested relief from § 1959(a)(1)'s mandatory minimum sentence of life imprisonment. The defendants argued for an extension of Supreme Court Eighth Amendment law, especially *Miller v. Alabama*, 567 U.S. __, 132 S. Ct. 2455 (2012), which, partly based on the fact that neurological features endemic to

adolescents reduced their culpability, held that "mandatory life-without-parole sentences for juveniles violate the Eighth Amendment." *Miller*, 132 S. Ct. at 2460; A110-11, ECF Nos. 1698, 1724. The defendants cited neuroscience studies that showed that the deficiencies in executive function and other features of the brain that *Miller* relied on persist into a person's mid-twenties. The district court denied the defendants' motion, A229-35, and sentenced Lopez to the mandatory three life sentences plus 420 months' imprisonment, A255, A261.

## SUMMARY OF ARGUMENT

In a typical year, anywhere from 140 to 200 federal defendants are sentenced under the Guideline for first-degree murder nationwide. Only about 6 to 10 percent of them are sentenced to life imprisonment. The rarity of the imposition of life sentences suggests that it is reserved for the worst offenders. In this case, Lopez received a mandatory life sentence, the second most severe penalty available in this country, despite being only twenty-two years of age at the time of the murders, never using a weapon during those murders or assisting the killers in any significant way. The sentence is, thus, grossly disproportionate to the crime and violates the Eighth Amendment's prohibition against cruel and unusual punishment.

Due to Lopez's age, the district court should have conducted an individual assessment of the sentencing factors at issue in this case. The Supreme Court

invalidated mandatory life sentences for minors based, in large part, on their intrinsic temperament. The Court relied on brain science that showed that, until a person reaches his or her mid- to late-twenties, the regions of the human brain that are critical to the processing of emotional information and regions important in cognitive control processes are still developing. People of this age, particularly males, are especially prone to engaging in risk-taking behaviors and a lack of self-control. The Supreme Court drew the line of immaturity at age eighteen. But the science upon which the Court relied made it clear that the brain conditions that made minors less culpable than adults persist for several more years. Lopez joined the Trinitarios when he was fourteen year of age and participated in the murders at issue here when he was twenty-two.

## ARGUMENT

### I. Lopez's Mandatory Life Sentence Categorically Violates the Eighth Amendment because of Lopez's Age and Role in the Offense

#### A. Applicable Law

The Eighth Amendment states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. "In identifying cruel and unusual punishments, the Supreme Court has not limited itself to 'historical conceptions' of impermissible sanctions, but has looked to the evolving standards of decency that mark the progress of a maturing society." *United States v. Reingold*, 731 F.3d 204, 210 (2d Cir. 2013). It is clear

that the Eighth Amendment proscribes "inherently barbaric" punishments. *Graham v. Florida*, 560 U.S. 48, 59 (2010). But a punishment can also be deemed "cruel and unusual" when it is "disproportionate to the crime." *Id.*

One of the two classes of proportionality cases "has used categorical rules to define Eighth Amendment standards." *Id.* at 60.[2] In this type of case, courts employ a two-step analysis:

> The Court first considers "objective indicia of society's standards, as expressed in legislative enactments and state practice" to determine whether there is a national consensus against the sentencing practice at issue. Next, guided by "the standards elaborated by controlling

---

[2] The other class of proportionality cases "involves challenges to the length of term-of-years sentences given all the circumstances *in a particular case*." *Graham*, 560 U.S. at 59 (emphasis added). In *Reingold*, this Court reviewed the Supreme Court's procedure for evaluating case-particular proportionality:

> In making a case-particular assessment of proportionality, the [Supreme] Court has employed a two-step analysis, first comparing the gravity of the offense and the severity of the sentence. Given the principles already discussed, the Court has observed that it will be the rare case in which this threshold comparison leads to an inference of gross disproportionality. Should such an inference arise, however, the second step of the analysis requires a court to compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. Only if this comparative analysis validates an initial judgment that the sentence is grossly disproportionate will the sentence be deemed "cruel and unusual."

*Reingold*, 731 F.3d at 211 (internal citation, quotation marks and alteration punctuation omitted) (quoting *Graham*, 560 U.S. at 60); *see also Harmelin v. Michigan*, 501 U.S. 957 (1991) (Kennedy, J., concurring). Lopez does not request that this Court make a case-particular assessment of the proportionality of his sentence.

precedents and by the Court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose," the Court must determine in the exercise of its own independent judgment whether the punishment in question violates the Constitution.

*Graham*, 560 U.S. at 61 (internal citation omitted) (quoting *Roper v. Simmons*, 543 U.S. 551, 563 (2005) and *Kennedy v. Louisiana*, 554 U.S. 412, 421 (2008)).

Although the "clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures," *Atkins v. Virginia*, 536 U.S. 304, 312 (2002), there may be consensus against a sentencing practice even though not all jurisdictions have outlawed it. *Graham*, 560 U.S. at 66; *see also Kennedy*, 554 U.S. at 433 ("There are measures of consensus other than legislation."). In *Graham*, the Court examined sentencing *practices* and evaluated the frequency with which courts imposed statutorily authorized sentences. *Graham*, 560 U.S. at 62-63. Specifically, the Court found that only 109 juvenile offenders were serving sentences of life without parole for non-homicide offenses even though thirty-seven states, the District of Columbia and the federal government authorized such sentences. *Id.* Because that sentencing practice was "exceedingly rare," the Court concluded: "[A] national consensus has developed against it." *Id.* at 67 (internal quotation marks omitted) (quoting *Atkins*, 536 U.S. at 316).

With respect to the judicial exercise of independent judgment, courts must consider "the culpability of the offenders at issue in light of their crimes and

characteristics, . . . the severity of the punishment in question[, and] whether the challenged sentencing practice serves legitimate penological goals." *Id.* The first relevant inquiry courts make is into "the status of the offenders in question." *See, e.g.*, *id.* at 68. Next, courts consider "the nature of the offenses" to which the penalty at issue might apply. *See, e.g.*, *id.* at 68-69. Courts then weigh the severity of the punishment in question. *See, e.g.*, *id.* at 69-71. Finally, courts consider the penological justifications for the sentencing practice. *See, e.g.*, *id.* at 71-75.

## B. Discussion

### a. Objective Indicia of Society's Standards

There is a consensus in this country against imposing mandatory life sentences upon non-killer accomplices who played minimal roles in the offense. Although a number of states and the federal government authorize mandatory life sentences for accomplices in murders, the imposition of that penalty *in practice* is extremely rare.[3] *Cf. Graham*, 560 U.S. at 62-63, 67 (concluding that a national consensus had developed against imposing life-without-parole sentences on juveniles for non-homicide offenses based on the Court's finding that its imposition in such situations was "exceedingly rare"). In addition to § 1959(a)(1), there are several federal statutes imposing mandatory life sentences for first-degree murder without any other aggravating circumstance like prior felony convictions. *E.g.*, 18

---

[3] Research did not reveal the number of accomplices sentenced to mandatory life without parole sentences in the fifty states.

U.S.C. §§ 115, 351, 930(c), 1111, 1114, 1116, 1118, 1119(b), 1120, 1121(a)(1),

1203, 1503(b)(1), 1512(a)(1), 1751(a); 21 U.S.C. § 675. According to statistics

compiled by the U.S. Sentencing Commission, in 2010, those statutes mandated

life sentences on thirty occasions. App'x D at D-29, D-31 to U.S. Sentencing

Comm'n, *Report to Congress: Mandatory Minimum Penalties in the Federal

Criminal Justice System* (October 2011). Nine of the defendants receiving

mandatory life sentences for first-degree murder were convicted under the statute

at issue in this case—18 U.S.C. § 1959(a)(1). *Id.* at D-29. In that same year, 139

defendants were sentenced primarily under the first-degree murder Guideline—

section 2A1.1. U.S. Sentencing Comm'n, *2010 Sourcebook of Federal Sentencing

Statistics* Table 17. Thus, in 2010, only 9 out of the 139 defendants convicted of

first-degree murder faced *mandatory* life sentences pursuant to § 1959(a)(1). In

2013, nineteen people received life sentences for murder out of a total of 211

sentenced under § 2A1.1 as their primary Guideline. U.S. Sentencing Comm'n, *Life

Sentences in the Federal System* 5 (2015), available at

http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-

projects-and-surveys/miscellaneous/20150226_Life_Sentences.pdf; U.S.

Sentencing Comm'n, *2013 Sourcebook of Federal Sentencing Statistics*, Table 17

(2013), available at http://www.ussc.gov/sites/default/files/pdf/research-and-

publications/annual-reports-and-sourcebooks/2013/Table17.pdf.[4] Judging only

from the infrequency with which life sentences are meted out in the federal system,

even to murderers, the sentence that Lopez is serving is reserved for rare cases. In

sum, there is a consensus against accomplices to murder who play minimal roles in

the offense serving the second-most final and severe a penalty a person in this

country can receive.

### b. Judicial Exercise of Independent Judgment

Turning next to the status of the offenders in question, as discussed in more

detail, *infra*, in section II, the Supreme Court has emphasized that "[f]rom a moral

standpoint it would be misguided to equate the failings of a minor with those of an

adult, for a greater possibility exists that a minor's character deficiencies will be

reformed." *Roper*, 543 U.S. at 570; *accord Graham*, 560 U.S. at 68.[5] Since

*Graham*, the Court has acknowledged that the features of the brain's physiology

that cause minors to be eminently adaptable persists into late adolescence. *See*

*Graham*, 560 U.S. at 68 ("For example, parts of the brain involved in behavior

control continue to mature through late adolescence.").

---

[4] It is unknown how many of them faced *mandatory* life sentences.

[5] In support of this point, Lopez incorporates by reference the arguments he makes
below in support of the extension of *Miller* based on recent discoveries of the
persistence of brain immaturity into late adolescence.

With respect to the nature of the offenses to which the penalty at issue might apply, at least since *Enmund v. Florida*, 458 U.S. 782 (1982), the Supreme Court has recognized "that defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers." *Graham*, 560 U.S. at 69.

The holding in *Enmund* turned on the level of the defendant's participation in the murder. Enmund was the driver of the getaway car in an armed robbery in which his accomplices murdered an elderly couple who resisted the robbery. 458 U.S. at 784-86. Enmund was convicted and sentenced to death. The Florida Supreme Court held that "driving the escape car was enough to warrant conviction and the death penalty, whether or not Enmund intended that life be taken or anticipated that lethal force would be used." *Id.* at 786 n.2. The Supreme Court disagreed, concluding that that the Eighth Amendment prohibited the death penalty for defendants found guilty of felony murder who did not themselves "kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." *Id.* at 797-801. In support of its conclusion, the Court noted that Enmund "did not commit the homicide, was not present when the killing took place, and did not participate in a plot or scheme to murder," *id.* at 795, and that "the only evidence of the degree of [Enmund's] participation [was] the jury's likely inference that he was

the person in the car by the side of the road near the scene of the crimes . . . waiting to help the robbers escape." *Id.* at 786.

The Supreme Court revisited the imposition of the death penalty on defendants who were convicted of murder under the felony-murder doctrine in *Tison v. Arizona*, 481 U.S. 137 (1987). In that case, the defendants, who were brothers, helped their father and his cellmate escape from prison, gave them shotguns, helped flag down and kidnap a family on an isolated road, drove the family to a remote site, and then stood by as their father and his cellmate murdered the four family members. 481 U.S. at 139-41. The Court held that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." *Id.* at 158. In support of its holding, the Court noted that the *Tison* defendants: (1) "actively participated in the events leading to the death by, *inter alia,* providing the murder weapons and helping abduct the victims"; (2) were "present at the murder site, [and] did nothing to interfere with the murders"; (3) "ma[de] no effort to assist the victims before, during, or after the shooting"; (4) "after the murders . . . continued on the joint venture"; and (5) "could anticipate the use of lethal force" during the commission of their crimes. *Id.* at 145, 151 (internal quotation marks omitted).

In this case, Lopez did not kill or intend to kill on the two nights at issue here. The jury found Lopez guilty under one of two theories of accomplice

liability.[6] Either theory ensured that Lopez, a minimal participant in all three murders, would be punished as severely as the most culpable participants in the murders and in many cases more severely.[7] Like the defendant in *Enmund*, Lopez was peripherally involved in homicides that were precipitated by the hot-headed reactions of accomplices.

---

[6] Although the felony-murder doctrine was not used to convict Lopez like it was in *Edmund* and *Tison*, the theories under which Lopez was convicted of murder are based on similarly lessened mens rea standards. *See, e.g.*, Brian R. Gallini, *Equal Sentences for Unequal Participation: Should the Eighth Amendment Allow All Juvenile Murder Accomplices to Receive Life Without Parole?*, 87 Or. L. Rev. 29 (2008) (equating the felony-murder doctrine with accomplice/conspiracy theories of liability for the purpose of analyzing sentences imposed for first-degree murder where the defendant was not the killer and played a minimal role in that crime). The jury was instructed that it could find Lopez guilty of the murders at issue in this case under *Pinkerton v. United States*, 328 U.S. 640 (1946), which allows a jury to convict a defendant of an offense if it was committed "by a co-conspirator in furtherance of the conspiracy [and] was reasonably foreseeable to the defendant as a consequence of their criminal agreement." *Cephas v. Nash*, 328 F.3d 98, 101 n.3 (2d Cir. 2003). Alternatively, the jury was instructed that it could find Lopez guilty under the theory of aiding and abetting. Thus, Lopez's conviction either rested on the jury's finding that he reasonably should have foreseen that a homicide was possible or that, sharing the same intent as the principal, he "willfully and knowingly associated himself in some way with the crime, and willfully and knowingly sought by some act to help make the crime succeed." A155.

[7] Sosa, who provided the gun and pleaded guilty to two other murders, Cabrera, who was involved in the earlier altercation with Polanco that eventually led to his death and pleaded guilty to one other murder, Flores, who shot Polanco and pleaded guilty to one other murder, and Ballenilla, whose altercation with two rival gang members was a proximate cause of the Double Homicide, each testified pursuant to cooperation agreements and, pursuant to Guideline 5K1.1, expect to receive reduced sentences.

The Double Homicide began when Ballenilla, a government cooperator, called Lopez to come to his aid because members of another gang were overwhelming him. Lopez and his brother Lopez-Cabrera arrived at the scene and Lopez-Cabrera was armed. With no discussion or time to react, Lopez-Cabrera opened fire the instant the taxi's door opened. The entire murder—the formation of murderous intent, the foot-chase, and the gunshots—took seconds.

Lopez was an even more marginal figure in the Polanco murder. As Cabrera testified at trial, Lopez was reluctant to go along with the other three Trinitarios and said that he would rather go home to sleep. A133. When Lopez was in the taxi on the way to the eventual murder scene, he asked for the gun, likely in an effort to avoid bloodshed. A153. The many cooperators could not even agree as to whether Lopez ever entered the lobby of the apartment building where the murder took place, and none was able to assign any role in the activities that led to Polanco's murder to Lopez. *Compare* A130 (stating that Lopez was inside the building in front of the witness), *with* A133-34 (stating that Lopez was outside of the building). Lopez did not provide the gun used to kill Polanco, nor did he dispose of it; further, he served as neither a shooter nor a lookout. Again, the murder was not planned or even discussed, and the dispute that gave rise to the incident did not involve Lopez in any way. For these reasons, Lopez is like the defendant in *Enmund.*

This case is distinguishable from *Tison*, where the defendants planned and executed a brazen prison break and armed the eventual killers. The defendants in *Tison* knew that the killers were hardened, convicted murderers, one of whom had escaped from prison previously and, in the course of the escape, killed a guard. *Tison*, 481 U.S. at 139. Each of the defendants themselves played integral parts in the kidnapping that precipitated the homicides—one brother, appearing to be a stranded motorist, flagged down the car holding the victims and the other brother armed himself and hid on the side of the road. *Id.* at 139-40, 145.

Regarding the severity of the punishment at issue, before *Graham*, categorical bans under the Eighth Amendment "were made with respect to a single punishment—the death penalty." *Reingold*, 731 F.3d at 213 (internal quotation marks omitted) (quoting *Graham*, 560 U.S. at 60-61). That sentence is the most severe a person can receive. And, because of its severity and finality, the law requires sentencing judges and juries to give significance to "the character and record of the individual offender or the circumstances" and other "compassionate or mitigating factors." *Woodside v. North Carolina*, 428 U.S. 280, 304 (1976). That right has been reinforced several times to ensure "that the death penalty is reserved only for the most culpable defendants committing the most serious offenses." *Miller*, 132 S. Ct. at 2467; *see also Sumner v. Shuman*, 483 U.S. 66, 74-

76 (1987); *Eddings v. Oklahoma*, 455 U.S. 104, 110-12 (1982); *Lockett v. Ohio*, 438 U.S. 586, 597-609 (1978) (plurality opinion).

Second only to the death penalty, a life sentence without the possibility of parole is the most severe and final penalty available. In banning life without parole sentences for minors who committed non-homicidal offenses, *Graham* drew an analogy between a death sentence and life without parole. *Reingold*, 731 F.3d at 214. *Graham's* "'unprecedented' imposition of a categorical ban outside the context of capital sentencing derive[d] from the Court's recognition that life without parole for juveniles was 'akin to the death penalty.'" *Id.* (quoting *Miller*, 132 S. Ct. at 2466). As the *Graham* Court reasoned, "[t]he State does not execute the offender sentenced to life without parole," 560 U.S. at 69, but such a sentence "guarantees he will die in prison without any meaningful opportunity to obtain release, no matter what he might do to demonstrate that the bad acts he committed as a teenager are not representative of his true character, even if he spends the next half century attempting to atone for his crimes and learn from his mistakes," *id.* at 79.

It can be argued that life without parole, especially for someone as young as Lopez, is nearly as dire as a death sentence. Indeed, it is a common strategy for counsel representing defendants during the penalty phase of death penalty trials to ask juries to spare the defendant's life based on the fact that the defendant will suffer for decades in prison. *E.g.*, Katharine Q. Seelye, *Dispute Over Witnesses*

*Interrupts Boston Marathon Trial*, N.Y. Times, May 8, 2015, at A15. In the Boston Marathon bombing trial, the lead prosecutor characterized evidence detailing the likely conditions of a life sentence as "maybe the most important" consideration for the jury. *Id.*

Finally, none of the legitimate penological goals of sentencing are furthered by the sentence at issue in this case. Those goals include retribution, deterrence, incapacitation, and rehabilitation. *Ewing v. California*, 538 U. S. 11, 25 (2003).

"The heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender." *Tison*, 481 U.S. at 149; *cf. Graham*, 560 U.S. at 72 ("Even if the punishment has some connection to a valid penological goal, it must be shown that the punishment is not grossly disproportionate in light of the justification offered."). As discussed in more detail below, Lopez was a marginal participant in the murders more akin to the getaway driver in *Enmund* than the brothers in *Tison*. Lopez's role was limited to his presence at the scene and his membership in the charged racketeering entity. Unlike the defendants in *Tison*, Lopez never carried a firearm. And the murders, although foreseeable, were unplanned and were the results of skirmishes between gangs whose ranks consisted largely of teenagers.

The goal of deterrence is not served by the sentence at issue in this case either. "[T]he same characteristics that render juveniles less culpable than adults

suggest . . . that juveniles will be less susceptible to deterrence." *Roper*, 543 U.S. at 571. For all the reasons set forth, *infra*, in section II—lack of impulse control and the overvaluing of the esteem of peers, among others—adolescents "are less likely to take a possible punishment into consideration when making decisions." *Graham*, 560 U.S. at 72 (stated with respect to minors). A life sentence imposed upon a gang member who began his association with a violent street gang at the age of fourteen is not likely to deter other fourteen-year-olds from joining or entice eighteen-year-olds to quit such gangs.

The goal of incapacitation is also not served by a life sentence. As Lopez argues in section II, his association with the Trinitarios began during the time of the greatest change in the part of his brain that regulates emotional responses. The homicides occurred when he was at an age when the human brain is ill-equipped to resist peer pressure and violent impulses. There is no reason to believe that, at the age of fifty, say, Lopez will still pose a threat to society. Simply stated, Lopez is not the cold-blooded killer for whom a sixty-year sentence is appropriate. And he is certainly not the archetypal racketeer-murderer that Congress envisioned when it imposed mandatory life imprisonment for the crime of which Lopez was convicted.[8]

---

[8] Judging from the legislative history of the Comprehensive Crime Control Act of 1984, street gangs made up largely of adolescents – like the Trinitarios – were not

For similar reasons, the goal of rehabilitation does not justify the sentence at issue here. Because his brain is still gaining new capabilities, Lopez is especially receptive to rehabilitation. *See Graham*, 560 U.S. at 74. His ability to deliberate and reason will continue to develop. Yet, "[b]y denying [Lopez] the right to reenter the community, [Congress has made] an irrevocable judgment about [his] value and place in society." *Id.*

*Miller*, *Graham* and *Enmund* and their progeny apply equally to Lopez's sentence. Lopez's culpability is diminished because of the challenges young people

---

the intended targets of § 1959. In 1983, the Senate Judiciary Committee concluded with respect to § 1959:

> [T]he need for Federal jurisdiction is clear, in view of the Federal Government's strong interest, as recognized in existing statutes, in suppressing the activities of organized criminal enterprises, and the fact that the FBI's experience and network of informants and intelligence with respect to such enterprises will often facilitate a successful Federal investigation where local authorities might be stymied. Here again, however, the Committee does not intend that all such offenses should be prosecuted federally. Murder, kidnapping, and assault also violate State law and the States will still have an important role to play in many such cases that are committed as an integral part of an organized crime operation.

S. Rep. No. 98-225 at 305. This suggests that the life sentences mandated by § 1959 were intended for members of gangs whose sophistication outmatched local law enforcement. This was not such a case, as evidenced by the investigation being almost entirely run by the New York Police Department. As several of the cooperating witnesses confirmed, the Bad Boys set of the Trinitarios recruited primarily high school students from Kennedy High School in the Bronx, hardly the sophisticated criminals that Congress intended to neutralize when it passed the Comprehensive Crime Control Act.

have in regulating their emotional responses, resisting violence and ignoring peer pressure. At the same time, the murders with which Lopez was involved were not products of exhaustive planning. Rather, they were the results of heated inter-gang skirmishes. With respect to Lopez's personal involvement, he provided no support to the shooters and was convicted under lessened standards of *mens rea*. Mandatory life sentences, with no meaningful opportunity to account for mitigating factors, in cases such as this categorically violate the Eighth Amendment.

## II. The Eighth Amendment Mandates that the Sentencing Court Individually Consider Lopez's Sentence

### A. Applicable Law

The Supreme Court has long recognized that the capriciousness and diminished capacity of youth require special considerations for the sentencing of juvenile defendants. *E.g.*, *Roper*, 543 U.S. at 569. On that basis, *Miller* requires that sentencing courts conduct an individualized assessment of juvenile defendants' sentencing factors and fashion a particularized sentence based on those factors. 132 S. Ct. at 2467, 2469.

In *Thompson v. Oklahoma*, the Supreme Court categorically barred the execution of offenders under the age of sixteen because of their lack of maturity and responsibility. 487 U.S. 815 (1988). In the years since, the Court has extended *Thompson* to apply to offenders aged eighteen and younger, *Roper v. Simmons*,

543 U.S. 551 (2005) (holding that "the death penalty cannot be imposed upon juvenile offenders"), and prohibited the imposition of life-without-parole sentences upon minors who committed crimes other than murder in which no one was killed, *Graham*, 560 U.S. 48 (2010). The latest extension of this principle has been the Supreme Court's holding in *Miller*, which declared that even juveniles convicted of homicide cannot receive a *mandatory* sentence of life imprisonment and must receive a sentence based on considerations particular to the defendant. 132 S. Ct. at 2467, 2469.

## B. Discussion

Lopez's involvement with the Trinitarios began when he was fourteen years of age. When the murders at issue in this case occurred, he was twenty-two. During this period of cognitive development, a person's brain has not developed the features that are most critical to controlling emotions, making decisions and resisting impulses.

Knowledge of the human brain and the tools to study it have advanced exponentially in recent years, and the Supreme Court has acted in accordance with the science. In the last decade alone, the Supreme Court has relied on brain science more confidently. The Court has replaced unscientific concepts like "lack of maturity" and "underdeveloped sense of responsibility," *see Johnson v. Texas*, 509 U.S. 350, 367 (1993), with citations to social science studies, *see Roper*, 543 U.S.

at 569 (citing Arnett, *Reckless Behavior in Adolescence: A Developmental Perspective*, 12 Developmental Review 339 (1992) and Steinberg & Scott, *Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty*, 58 Am. Psychologist 1009, 1014 (2003)), and, finally, studies from the hard sciences, like neuroscience, *see Miller*, 132 S. Ct. 2464-65 & n.5.; *Graham*, 560 U.S. at 68 (citing amicus briefs from the American Medical Association and the American Psychological Association for the proposition that "parts of the brain involved in behavior control continue to mature through late adolescence"). As the Court indicated in *Miller*, the scientific support for this line of decisions has only strengthened with the passage of time. *Miller*, 132 S. Ct. at 2465 n.5.

The Supreme Court has drawn the current line of brain immaturity at age eighteen. But the anatomical and neuroscientific circumstances that supported the prevailing argument in *Miller* do not stop at age eighteen. In *Miller*, the Court was persuaded by evidence that the immaturity of adolescents' brains is responsible for their diminished cognitive abilities and executive functions and that this anatomical feature lessens their "moral culpability." *Id.* (quoting Brief for American Psychological Association et al. as Amici Curiae Supporting Petitioners 4, *Miller v. Alabama*, 132 S. Ct. 2455 (Nos. 10-9646, 10-9647)) ("'It is increasingly clear that adolescent brains are not yet fully mature in regions and systems related

to higher-order executive functions such as impulse control, planning ahead, and risk avoidance.'"). There is no consensus over when adolescence ends, which is a reflection of the fact that features of personality and anatomy mature at different rates in different people.[9] One of the last body parts to mature into adulthood is the brain, especially the parts of the brain associated with risk assessment, impulse control, and emotional regulation. *See* Brief for the American Medical Association and the American Academy of Child and Adolescent Psychiatry as Amici Curiae in Support of Neither Party 20-23, *Graham v. Florida*, 560 U.S. 48 (2010) (Nos. 08-7412, 08-7621).

One region of the brain that is important to executive function is the prefrontal cortex, which is not fully developed until "late adolescence or beyond." *id.* at 23 ("Brain imaging data, supported by data gathered through the older autopsy technique, provides credible evidence that the prefrontal cortex is still

---

[9] Attempts to fix limits on the beginning and end of adolescence have proven futile, as the variety of definitions in medical dictionaries shows. *Compare Adolescence Definition*, The American Heritage Medical Dictionary, http://mcaf.ee/lkqm7 (last visited Dec. 10, 2015) ("The period of physical and psychological development from the onset of puberty to complete growth and maturity."); *with Adolescence Definition*, Dorland's Medical Dictionary for Health Consumers ("the period between puberty and the completion of physical growth, roughly from 11 to 19 years of age."); *and Adolescence Definition*, Mosby's Medical Dictionary, 8th ed. 2009 ("the period in development between the onset of puberty and adulthood. It usually begins between 11 and 13 years of age with the appearance of secondary sex characteristics and spans the teenage years, terminating at 18 to 20 years of age with the completion of the development of the adult form.").

developing well into adolescence and beyond and is among the last portions of the brain to mature. In other words, development of the region of the brain associated with voluntary behavior control (i.e., risk assessment, impulse control, and emotional regulation) is not complete until late adolescence or beyond."); *accord* Laurence Steinberg, *A social neuroscience perspective on adolescent risk-taking*, 28 Developmental R. 78 (2008).[10]

An important development in the prefrontal cortex during this time is called myelination. Temple University psychology professor Laurence Steinberg succinctly explains:

> [During adolescence,] there is an increase in white matter in these same regions, reflective of myelination, the process through which nerve fibers become sheathed in myelin, a fatty substance that provides a sort of insulation of the neural circuitry. Unlike the synaptic pruning of the prefrontal areas, which takes place [in] early adolescence, myelination is ongoing well into the second decade of life and perhaps beyond. *Improved connectivity within the prefrontal cortex should be associated with subsequent improvements in higher-order functions subserved by multiple prefrontal areas, including many aspects of executive function, such as response inhibition, planning ahead, weighing risks and rewards, and the simultaneous consideration of multiple sources of information*. In contrast to our findings with respect to basic information processing, which showed no maturation beyond age 16, we found continued improvement beyond this age in self-reported future orientation (which increased through age 18) and in planning (as indexed by the amount of time subjects waited before making their first move on the Tower of London task, which increased not only through adolescence but through the early 20s).

---

[10] A199-A228.

A215 (internal citation omitted; emphasis added). Myelination can be further delayed if the person's mother experienced regular moderate to severe stress while that person was *in utero*. Stress causes corticosteroids to be released, and repeated corticosteroid stimulation to a fetus has been shown to delay myelination in developing sheep. Sarah A. Dunlop, et al., *Repeated prenatal corticosteroids delay myelination in the ovine central nervous system*, 6 J. Maternal-Fetal and Neonatal Med. 309-13 (1997).

At the same time that the prefrontal cortex is maturing, the brain is forming better connections between cortical areas (like the prefrontal cortex) and subcortical areas. According to Prof. Steinberg:

> This . . . anatomical change should be associated with improved coordination of affect and cognition, and reflected in improved emotion regulation, facilitated by the increased connectivity of regions important in the processing of emotional and social information (e.g., the amygdala, ventral striatum, orbitofrontal cortex, medial prefrontal cortex, and superior temporal sulcus) and regions important in cognitive control processes (e.g., the dorsolateral prefrontal cortex, anterior and posterior cingulate, and temporo-parietal cortices). Consistent with this, we found increases in self-reported impulse control through the mid-20s.

A216 (internal citation omitted). That these processes continue into a person's twenties leads to the unavoidable conclusion that "age 18 does not suddenly mark complete transition to adulthood." Nat'l Research Council, *Reforming Juvenile*

*Justice: A Developmental Approach* 91 (Wash., D.C.: The Nat'l Academies Press 2013).[11]

The type of impaired decision-making associated with adolescence persists into the mid-twenties, and then tapers off. *See* Dana Goldstein, "Too Old to Commit Crime?" *N.Y. Times*, Mar. 22, 2015, at SR4 ("Criminal careers are short for a number of reasons. Neuroscience suggests that the parts of the brain that govern risk and reward are not fully developed until age 25, after which lawbreaking drops off."). As a National Research Council report has concluded, "[t]he preference for risky behaviors rises by a third of a standard deviation between ages 10 and 16, and then it declines by a half standard deviation by age 26." A162.

The lack of executive control is more pronounced in *male* adolescents than it is in female adolescents. *See* M.R. Asato et al., *White Matter Development in Adolescence: A DTI Study*, Cerebral Cortex (Sep. 2010) (reporting a study based on the MRI scans of over 110 people ranging in age from eight to twenty-eight).[12] This accounts in part for "higher mortality in males due to risk-taking behavior and conduct disorders." A189; *see also* A194 ("Males had a more protracted course with the majority of tracts continuing to develop into adulthood."). There is also

---

[11] A159-88.

[12] A189-98.

evidence that adolescents are far more impelled by peer pressure to take risks and to behave in an antisocial manner than are adults. A212. The consensus view among brain researchers is that adolescence in males, in the context of risk-taking behaviors and self-control, extends into the twenties and, in many cases, into the mid- to late-twenties. Thus, there is no rational reason to draw a line of diminished moral culpability at age eighteen.

The remedy is to allow the sentencing court to make a particularized assessment of Lopez's sentence. Mandatory life imprisonment is the only federal penalty that does not provide for an individualized assessment of the defendant's relative culpability. A life sentence in this case is far more arduous and inhumane given Lopez's age and life expectancy. The term of imprisonment could easily be sixty years, three times the median sentence for federal murder. U.S. Sentencing Comm'n, *2014 Sourcebook of Federal Sentencing Statistics*, Table 13 (2014), available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2014/Table13.pdf (showing that median sentence for murder among the federal courts in 2014 was 240 months). *Miller* "mandates only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty." 132 S. Ct. at 2471. The Court's decree was based on the cognitive limitations of adolescents, which is endemic to them. As demonstrated above, age

eighteen is in the midst, not at the end, of a period of neurological immaturity that bears directly on risk-taking and the capacity for rehabilitation. There is no rational reason to limit *Miller's* procedural requirement to offenders under that age.

## III.    Joining in the Arguments of Codefendants

In addition to the arguments presented above, Lopez respectfully requests leave from this Court to join in the arguments made by his codefendants to the extent that those arguments apply to him.

## CONCLUSION

The judgment of conviction should be vacated and the case should be remanded for resentencing.

Dated:        Brooklyn, New York
                 December 18, 2015

                                              Law Offices of Susan G. Kellman

                                              /s/ Susan G. Kellman
                                              Susan G. Kellman
                                              25 Eighth Avenue
                                              Brooklyn, New York 11217
                                              (718) 783-8200

                                              *Attorney for Defendant-Appellant Lopez*

Ezra Spilke (on the brief)
Law Offices of Ezra Spilke
276 Franklin Street, 3R
Brooklyn, New York 11222

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure,

the foregoing brief is in <u>14-Point Times New Roman</u> proportional font and

contains 7,193 words and thus is in compliance with the type-volume limitation set

forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

Dated:      December 18, 2015
               Brooklyn, New York

                                  Law Offices of Susan G. Kellman

                                  <u>/s/ Susan G. Kellman</u>
                                  Susan G. Kellman
                                  Ezra Spilke (Of Counsel)
                                  25 Eighth Avenue
                                  Brooklyn, New York 11217
                                  (718) 783-8200

                                  *Attorneys for Defendant-Appellant Lopez*